<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

—————————————————————

SEGUNDO R. ROJAS,                    :
                                     :   **Civil Action No. 12-2220 (ES)**
                **Plaintiff,**   :
    **v.**                         :
                                     :       <u>OPINION</u>
**ACUITY BRANDS LIGHTING, INC.,**    :
                                     :
                **Defendant.**  :
—————————————————————      :

**SALAS, DISTRICT JUDGE**

      Pending before this Court is Defendant Acuity Brands Lighting, Inc.'s ("ABL") motion for summary judgment. (D.E. No. 42). The Court held oral argument on this motion on May 28, 2014. The Court has jurisdiction over this case based on 28 U.S.C. § 1332. For the following reasons, the Defendant's motion with respect to Plaintiff's claim of age discrimination under the New Jersey Law Against Discrimination, N.J.S.A. 10: 5-4.5 is GRANTED. The Defendant's motion for summary judgment as to each of Plaintiff's other claims is DENIED.

**I. FACTUAL BACKGROUND**

      This is an employment discrimination action for termination based allegedly on disability, age, and national origin, in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10: 5-4.5 ("NJLAD"), as well as for violation of the Federal Family and Medical Leave Act 29 U.S.C. 2601 ("FMLA").

      Segundo Rojas ("Plaintiff") worked for Mark Lighting, and then the company that purchased it, ABL, continuously for approximately 28 years. (D.E. No. 52-3, Ex. A, Complaint ("Compl.") ¶ 1). In June 2011, Plaintiff was authorized to leave work for a vacation to Ecuador, to last from June 27 to July 12, 2011. (Compl. ¶ 4). Plaintiff returned from Ecuador on Saturday, September 10 and reported to work on Monday, September 12. (Compl. ¶ 11).

Plaintiff claims he could not return to work at the scheduled time because he was suffering from a bout of Diverticulitis, which confined him to his home in pain and made his experience in Ecuador "the worst holiday[] or vacation[] of [his] life," (D.E. No. 52-4, Deposition of Segundo Rojas ("S. Rojas Dep.") 136:15-16; *see also* S. Rojas Dep. 133-36). While in Ecuador, Plaintiff did not contact Defendant ABL directly to notify it of his illness and absence from work, because he could not speak English and did not know the appropriate fax number. (S. Rojas Dep. 29:1-11, 9:7-13). Plaintiff claims that on or around July 8, he faxed his daughter medical records corroborating his illness and inability to return home. (S. Rojas Dep. 23:6-10). Plaintiff instructed his daughter to give these documents to his son, Washington Rojas—also an employee of the ABL facility, who was on medical leave at the time—so that Washington could advise ABL of Plaintiff's medical condition. (S. Rojas Dep. 42:5-14). Washington claims that he spoke with a shop steward and representative of Plaintiff's union, Calvin Hughes, and was assured everything would be fine. (*Id*.). The Parties dispute when this conversation occurred, what information was shared, and to whom the information was conveyed. (Defendant Statement of Material Facts ("Def. Stat. Mat. Facts"), ¶ 46). Importantly, Plaintiff claims the information was related to both the Plant Manager, Dominick Raimone, and to the head of Human Resources, Brad Feldmeyer, prior to Plaintiff's termination. (D.E. 52-2, Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp. Br."), at 18).

When Plaintiff did not show up for work for three days after the end of his scheduled leave, a termination letter was mailed to his home. (*See* Dillon Cert. Ex. K). Plaintiff alleges that he was discriminated against on the basis of his disability, national origin, and age, in violation of the NJLAD, and that ABL violated the FMLA in its actions with respect to the aforementioned leave.

## II. LEGAL STANDARD

A court shall grant summary judgment, pursuant to Fed. R. Civ. P. 56(a), "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine issue of material fact compels a trial. *Id.* at 324. In presenting that evidence, the non-moving party must offer specific facts that establish a genuine issue of material fact, not merely "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Therefore, the non-moving party may not rest upon the mere allegations or denials in its pleadings. *See Celotex,* 477 U.S. at 324. The court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). That is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. DISABILITY DISCRIMINATION UNDER THE NJLAD

This case is governed by the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a *prima facie* case of disability discrimination in violation of the NJLAD, Plaintiff must prove, first, that he was a member of the protected class, that is, that he was disabled within the meaning of the NJLAD; second, that he was performing his job at a level that met ABL's legitimate expectations; third, that his employment was nevertheless terminated; and, fourth, that the employer sought someone to perform the same work after he left. *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 450 (2005). Plaintiff's evidentiary burden at this *prima facie* stage is "rather modest: it is to demonstrate to the Court that Plaintiff's factual

3

scenario is compatible with discriminatory intent—i.e., that discrimination *could* be a reason for the employer's action."  *Id.* at 447 (internal quotation marks omitted).  However, "the plaintiff must [also] demonstrate that the defendant employer knew of the disability to state a *prima facie* case of unlawful discharge."  *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).

After the demonstration of a *prima facie* case, which "creates an inference of discrimination," the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination.  *Zive*, 182 N.J. at 449.  Finally, if the employer meets this burden, "the burden of production shifts back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision."  *Id.*

## A. *PRIMA FACIE* CASE

### 1. Plaintiff's Disability

Pursuant to the NJLAD, a "disability" is defined as an "infirmity . . . caused by . . . illness . . . which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques."  N.J.S.A. § 10:5-5(q).  The Court must determine whether there is a genuine issue of material fact as to whether Plaintiff's alleged medical condition constitutes a disability.

Plaintiff has provided several medical records from which a reasonable finder of fact can infer that Plaintiff at the time he claims he was discriminated against, suffered from an infirmity caused by an illness that prevented the normal exercise of Plaintiff's bodily or mental functions, pursuant to the definition in the N.J.S.A. § 10:5-5(q).  Plaintiff claims that since approximately 1996 or 1998, in which time he was hospitalized and diagnosed with Diverticulitis, he has suffered from gastrointestinal problems.  (*See* S. Rojas Dep. 15:10–20).  First, Plaintiff was evaluated and given a colonoscopy in April 2007 at Palisades Medical

4

Center in North Bergen, New Jersey after ongoing gastrointestinal complaints. (*See* Dillon Cert. Ex. D; S. Rojas Dep. 158:18–20). Second, Plaintiff was hospitalized for four days, diagnosed with acute Diverticulitis, treated by three doctors, and prescribed antibiotics between October 18 and October 22, 2008 at Christ Hospital in Jersey City, New Jersey. (*See* Dillon Cert. Ex. E; S. Rojas Dep. 159:2–5, 159:23–160:18). Third, in April 2011, only a few months before Plaintiff claims that due to his illness he was stranded in Ecuador and could not return to work, a doctor ordered a CT scan of Plaintiff's abdomen and pelvis after he complained of abdominal pain. (*See* Dillon Cert. Ex. F). Finally, when in Ecuador in July 2011 during the relevant leave, Plaintiff claims he experienced pain, faintness, vomiting, and diarrhea. (*See* S. Rojas Dep. 133:22–134:1). On July 8, he visited a doctor and was diagnosed with "Colitis," a diverticular disease, and instructed by a medical certificate that he should rest between July 8 and July 31. (*See* Dillon Cert. Ex. I).[1] For at least three weeks, Mr. Rojas claims he experienced pain and "a very strong infection in the stomach." (*See* S. Rojas Dep. 135:22.). Mr. Rojas again, on August 1, visited the same doctor and was diagnosed with "Diverticulitis" and instructed by another medical certificate that he should rest between August 1 and September 8. (*See* Dillon Cert. Ex. J).[2] While sick in Ecuador, Plaintiff claims he "could not

---

[1] Defendant objects to Plaintiff's submission of the July 8 and August 1 medical certificates, Plaintiff's Exhibits I and J, on the ground that "Plaintiff fail[ed] to provide a certified translation of the document[s]." (*See*, e.g., D.E. No. 56-1, Defendant's Reply to Plaintiff's Statement of Material Facts ("Def. Rep.") at 9, 10, 14, 20). The most relevant language in the documents, however, is not in need of translation: "Diverticulitis" and "Colitis," Plaintiff's diagnoses, mean the same thing and retain even the same spelling in English and Spanish. The dates—Julio and Agosto, July and August—are also cognates; and of course the numbers "0," "1," "2," "3," and "8" mean the same thing in both languages. Finally, Defendant itself provided a translation of the Spanish phrase "debiendo guardar reposo,"stating that it means "[Plaintiff] should rest." (*See* Pl. Br. at 8). This is the meaning that Plaintiff also ascribes to this phrase, so this court will consider the documents accordingly.

[2] Defendant objects to Plaintiff's reliance on much of these medical records, claiming that they are "unauthenticated document[s] and constitute[] inadmissible hearsay under Federal Rules of Evidence 801 and 802." Def. Rep. at 6; *see also* Def. Rep. at 6–41. But Fed R. Evid. 803(4) excludes from the rule against hearsay "[a] statement that . . . is made for—and is reasonably pertinent to—medical diagnosis or treatment; and . . . describes medical history; past or present symptoms or sensations; their inception; or their general cause." Each of the medical documents cited in this order—to wit, the hospital forms from Palisades and Christ Hospitals, the prescription ordering the CT scan, and the medical certificates from the doctor in Ecuador—are statements made for and reasonably pertinent to medical diagnosis or treatment and describe either past or present symptoms or their general cause. This Court, accordingly, shall not refrain from considering these documents on the ground that they are inadmissible hearsay.

do any lifting . . .[,] would get dizzy from time to time . . .[,] could not bend over without pain . . .[,] stayed in bed for the majority of the time because he felt weak . . .[, and] had to frequently go to the bathroom and had sharp pain in his side."  (Dillon Cert. Ex. C).[3]  Plaintiff claims that he did not became healthy enough to travel until September 8.  (*See* S. Rojas Dep. 135:14).

Another court in this District considered a plaintiff with Diverticulitis, but concluded that "there [wa]s no indication from the record that [the illness] prevented the normal exercise of bodily and mental functions."  *O'Hare v. McLean Packaging & Trucking*, No. 08-2083, 2009 WL 3207277 at *33 (D.N.J. Sept. 29, 2009).  The above evidence suggests that Plaintiff's case is distinct from *O'Hare*, and that a reasonable finder of fact could infer that Plaintiff suffered from an illness, Diverticulitis (or the related gastrointestinal disease, Colitis), which

---

Further, Fed. R. Evid. 901(b)(4) states that "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances" can serve to authenticate an item of evidence.  Thus, the Third Circuit has "determined that the contents of challenged documents themselves can support a claim of authenticity, and in that case relied upon the specificity, regularity, and official appearance of the documents as providing sufficient circumstantial evidence."  *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) (citation omitted) (internal quotation marks omitted).  "The burden of proof under Rule 901 is slight, requiring only a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be."  *United States v. Balice*, 505 F. App'x 142, 146 (3d Cir. 2012) (citation omitted) (internal quotation marks omitted).  In this case, the official appearance and contents of these documents, considered in light of the fact that they hail from separate authors and all corroborate the same type of medical condition, lead this Court to conclude that the documents have been sufficiently authenticated pursuant to Fed. R. Evid 901; there is thus "a foundation from which the fact-finder could legitimately infer that the evidence is what [Plaintiff] claims it to be."  *id.*

[3] Though Plaintiff included a doctor's report that corroborates Plaintiff's history of gastrointestinal illness, *see* Dillon Cert. Ex. Q, Defendant correctly noted at oral argument that an "unsworn [expert's] statement does not meet the requirements of Fed. R. Civ. P. 56[(c)(4)]" and thus it is "not competent to be considered on a motion for summary judgment."  *Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989).

The plain language of *Fowle*, however, does not apply to medical records, such as those described in n.1, *supra*, in the same manner it applies to expert testimony or doctors' reports.  The *Fowle* court relied on a note in *Adickes v. Kress*, 398 U.S. at 158 n.17 (1970), that applied to a *person's* testimony.  And the *Fowle* court's explanatory parenthetical stated that the "unsworn *statement* does not meet the requirements of Fed. R. Civ. P. 56[(c)(4)]."  868 F.2d at 67 (emphasis added).  District courts, generally, have thus not applied *Fowle* beyond experts' reports, narrowly characterizing the Third Circuit's ruling.  *See, e.g.*, *Coley v. Cnty. of Essex*, 2010 WL 3040039 at *4 n.3 (D.N.J. Aug. 4, 2010) *aff'd*, 462 F. App'x 157 (3d Cir. 2011) ("An unsworn expert report does not constitute evidence in regard to making a summary judgment determination."); *Deitrick v. Costa*, 2014 WL 268681, at *18 (M.D. Pa. Jan. 23, 2014) ("The Third Circuit has held that this rule requires expert report to be sworn to by the expert witness."); *INVISTA N. Am. S.%22a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 626, 641 n.6 (D. Del. 2013) *reconsideration denied*, 2013 WL 3624014 (D. Del. July 12, 2013) ("[T]he Third Circuit found an unsworn expert report to be inadmissible on summary judgment for not complying with Federal Rule of Civil Procedure 56.").  This Court concurs and will not apply the ruling in *Fowle* to the medical records at issue.

caused an infirmity that prevented the normal exercise of Plaintiff's bodily functions—including lifting and bending over without pain. However, Defendant claims "[t]here is no evidence that Plaintiff was prevented from engaging in the normal exercise of his bodily functions as required by [the NJLAD]." (Def. Stat. Mat. Facts ¶ 54 (citing S. Rojas Dep. 16:6–8, 22)). Thus, there is a genuine issue of material fact as to whether Plaintiff was disabled within the meaning of the NJLAD.

### 2. Job Qualification

To satisfy the job qualification prong of the *McDonnell Douglas* test, "[a]ll that is necessary is that the plaintiff produce evidence showing that [h]e was actually performing the job prior to the termination." *Zive*, 182 N.J. at 454. Hence, Plaintiff has a "slight burden." *Id.* at 455.

Plaintiff worked for Defendant continuously for approximately 28 years. (*See* S. Rojas Dep. 145:4–6). Plaintiff is described by his former manager, Dominick Raimone, as "highly skilled." (D.E. No. 52-5, Deposition of Dominick Raimone ("Raimone Dep.") 37:22).

Up until his authorized departure from work for a vacation to Ecuador, Plaintiff was actually performing his job. Plaintiff, so far as the record suggests, has had no problems with attendance or tardiness and has never been disciplined for any misconduct. (*See* D.E. No. 52-6, Deposition of Bradley A. Feldmeyer ("Feld. Dep.") 37:20–38:1). His attendance was thus "reasonably regular, reliable, and predictable." *See Svarnas v. AT & T Commc'ns*, 326 N.J. Super. 59, 78 (App. Div. 1999). Defendant, curiously, states that "Plaintiff did not miss *any* work because of his Diverticulitis" in the three years prior to 2011 and that "he has promptly returned to work ready and able to work" after each time he has suffered from his illness. (Def.'s Br. at 12 (emphasis in original)).

The above evidence suggests that a reasonable finder of fact could conclude that Plaintiff, prior to the illness at issue, was performing his job at a level that met ABL's legitimate

expectations.  Defendant claims that "Plaintiff . . . cannot [prove] . . . that he was otherwise

qualified to perform his job."  (Def. Br. at 13).  Thus, there is a genuine issue of material fact

as to whether Plaintiff meets the job qualification prong of the NJLAD.

### 3. Termination

The third prong of the *McDonnell Douglas* test requires that Plaintiff prove "he . . . was

fired."  *Zive,* 182 N.J. at 450.  A termination letter dated July 15, 2011 was mailed to Plaintiff's

home.  (*See* Dillon Cert. Ex. H).  Further, Plaintiff testified that when he returned to work on

September 12, the Plant Manager told him "You're already fired."  (S. Rojas Dep. 27:2).  It is

not clear whether Defendant can or does contest that Plaintiff was terminated.[4]

The Third Circuit has stated that "the plaintiff must [also] demonstrate that the

defendant employer knew of the disability to state a *prima facie* case of unlawful discharge."

*Geraci*, 82 F.3d at 581.  Hence, whether ABL had notice of Mr. Rojas's alleged disability is an

important inquiry and a point of great contention in this case.[5]  While Defendant claims "that

no ABL manager even knew that Plaintiff's absence was related to his Diverticulitis when he

---

[4] Defendant, in its brief, argues that "Plaintiff cannot show that he was terminated *because of* his alleged disability."  Def. Br. at 14 (emphasis added).  Defendant attempts to rely on *Cuozzo v. Davis-Standard, LLC*, 2012 WL 845927 at *5 (D.N.J. Mar. 13, 2012)  to establish the alleged requirement that Plaintiff prove, *in his prima facie case*, that he was terminated *because of* his disability, not simply that he was terminated.  But this interpretation is in tension with the plain text of *Zive*, which states simply that "a plaintiff must prove that . . . (3) he . . . was fired."  182 N.J. at 450.  Moreover, as the New Jersey Supreme Court stated:

> The evidentiary burden at the *prima facie* stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent . . . .

*Zive*, 182 N.J. at 447 (internal quotation marks omitted).

Defendant's argument purports to establish that Plaintiff, at this *prima facie* stage, must establish not merely that Defendant's termination of Plaintiff is *compatible* with discriminatory intent, but also that Defendant's termination of Plaintiff was *in fact motivated by* discriminatory intent.  (*See* Def. Br. at 14, the broader heading of which is entitled "Plaintiff Cannot Establish A *Prima Facie* Case Of Discrimination.")  Defendant's argument, in this regard, is thus in tension with New Jersey Supreme Court precedent and cannot be accepted.

[5] It appears that Defendant addresses the notice requirement hailing from *Geraci* in the context of the third prong of the *McDonnell Douglas* test.  (*See* Def. Br. at 14, where *Geraci* is cited under the section titled "Plaintiff Was Not Terminated Because Of His Stated Medical Condition.")  The Court will likewise consider the issue of notice in the context of *McDonnell Douglas*'s third prong.

was fired" (Def. Stat. Mat. Facts ¶ 46), Plaintiff claims that his son "went to Hughes with the medical certificate and papers regarding his father's medical condition . . . and . . . ABL had notice," given that the Plant Manager "Raimone spoke with Hughes, and those communications were related to Feldmeyer," the head of human resources who chose to terminate Plaintiff. (Pl. Opp'n Br. at 18).

### a. Shop Stewards

Defendant emphasizes that because Plaintiff failed to meet ABL's requirement that an employee inform an *ABL manager* of impending absence from work, the termination of Plaintiff was justifiable and backed by non-pretextual reasoning. (*See, e.g.,* Def. Br. at 6 ("Plaintiff declined to contact any manager."); Oral Argument Transcript ("OA Tr.") 8:10 – 14 ("There is no evidence anywhere in the voluminous record that any ABL manager . . . knew where the plaintiff was . . . .")). Defendant, similarly, argues that as a result of Plaintiff's alleged failure to inform ABL management of his illness or absence, Plaintiff cannot prove ABL knew he suffered from a disability. (*See, e.g.,* Def. Br. at 14; *id.* at 7 ("Washington only spoke with Calvin Hughes, an hourly employee and union shop steward, about his father's whereabouts."); OA Tr. 10:4 – 9). At oral argument, Plaintiff responded, first, that Plaintiff was not clearly subject to the alleged absence-reporting requirement, *see, e.g.*, OA Tr. 35:15 – 21, and, second, that an ABL shop steward's role is similar to an ABL manager, so that a shop steward's notice of Plaintiff's illness and absence could constitute, or inevitably lead to, the Defendant-ABL's notice of that illness and absence, *see, e.g.*, OA Tr. 40 – 41.

The below evidence suggests that ABL's shop stewards, Calvin Hughes and Otis Abraham, possess considerable authority within Defendant's plant and often participate in employment decisions or the termination process. Thus, there is a genuine issue of material fact as to whether their notice of Plaintiff's medical condition could constitute or inevitably lead to ABL's notice of Plaintiff's medical condition.

Washington Rojas—Plaintiff's son, with whom Plaintiff claims he sent information about his illness to ABL— testified that

> anything happened in the company, Otis will take care of any problems. And if any decisions–big decision, whatever had to be made, he will call Calvin and Calvin determined, okay, do this or do that or wait until I get there and we'll discuss the matter.

(D.E. No. 52-5, Deposition of Washington Rojas ("W. Rojas Dep.") 23:3-10).

Later, Washington testified that "Calvin Hughes is the main guy.  I don't want to go to the next main guy, that's him.  He call the shots, he is shop steward." (*Id. at* 47:18–22). Plaintiff's Collective Bargaining Agreement groups "shop steward and Plant Manager" together, in the context of authority over "Sick Days."  (*See* Dillon Cert. Ex. B at 9–10).  And ABL's Vacation Request form states that employees should "check with [their] shop steward about [their] total vacation days."  (*See* Dillon Cert. Ex. G).  Though the "Vacation Request" form states that "[r]equests will be reviewed by [employees'] immediate supervisor," the form does not distinguish an immediate supervisor from a shop steward, or distinguish either shop steward or immediate supervisor from a "manager" or "Acuity management."  (*See id.*).  The form does not use the terms "manager" or "Acuity management."  (*See id.*).  Further, Dominick Raimone, ABL's Plant Manager, testified that employees were accustomed to speaking with him—that is, a manager but not shop steward—about their remaining vacation days.  (*See* Raimone Dep. 62:1–6).  And Plaintiff testified that the shop steward Hughes is "somebody that represents the company."  (*See* S. Rojas Dep. 40:11-17).  Considered with the rest of the foregoing evidence, Plaintiff's confusion about whether Raimone was a manager or a foreman—"I don't know what he is"—could support the proposition that employees, generally, do not know the precise titles and functions of higher ranking employees, or do not perceive the distinction between a manager and a shop steward.  (*See* S. Rojas Dep. 83).

But beyond possible employee perception, Raimone testified that ABL "would usually send somebody from the human resource department down to sit with the shop stewards or the

10

union delegates, and they would make the decision for termination." (Raimone Dep. 37:8–11). This testimony could support the inference that the positions of manager and shop steward are indistinct. If shop stewards do indeed participate in employment or termination decisions— and do so *usually*—as Raimone's testimony suggests, it is possible or perhaps likely that a shop steward's knowledge of an employee's disability could infect the employment decision process.

Therefore, a reasonable finder of fact could conclude that because shop stewards bear considerable authority and have frequent opportunity to participate in the termination process, notice to a shop steward of a disability can be treated as, or be assumed to lead to, ABL's notice of that disability.

### b. Notice

Plaintiff, in his deposition, testified as to when and in what order he communicated with his family when, from Ecuador, he faxed medical certificates that diagnosed him with gastrointestinal disease and stated that he should rest:

> First, I spoke with my son. Then I spoke with my daughter when my son told me that he needed the fax because a fax was sent. Then I spoke with my daughter telling her that a fax had been sent. My daughter gave the fax to Washington, to my son, and several days afterwards, I don't remember how many days, I spoke with Washington, and then I asked if he had delivered the fax, and Calvin told him not to worry, that everything was fine.

(S. Rojas Dep. 42:5–14).

Plaintiff testified that he sent the fax on July 8. (*See S. Rojas Dep.* 23:6–10). Washington testified that he delivered the documents and spoke to Hughes on or about Monday, July 11. (*See* W. Rojas Dep. 47:3–6). When specifically questioned by Defendant's counsel about whether he submitted the documents after August 1, Washington Rojas testified that it was "not necessarily" the case that he delivered the medical documents to Calvin Hughes after that date. (*See* W. Rojas Dep. 108:2–9). And Plaintiff's brief, in accordance with the

earlier cited testimony, states that "Washington went to Hughes with the medical certificate and papers regarding his father's medical condition in July." (Pl. Opp'n Br. at 19).

Calvin Hughes, ABL's shop steward, stated that "sometime after [Plaintiff] was scheduled to return to work, [Washington Rojas] contacted [Hughes] and told [Hughes] his dad was travelling and had become ill and was hospitalized." (Taylor Dec. Ex. D ¶ 6). It is conceivable that this conversation took place after Plaintiff was scheduled to return to work—July 12, (*see* Compl. ¶ 4)—but before he was terminated—July 15, (*see* Dillon Cert. Ex. K)—consistent with Washington's testimony that he spoke with Hughes on or around July 11. (*See* W. Rojas Dep., 47:3–6). But when Calvin Hughes actually received the medical documentation from Washington is disputed. (*See* Taylor Dec., Ex. D ¶ 7 ("[Washington] did submit those documents to me about two weeks after [Plaintiff] was supposed to return to work.")).

Plaintiff was terminated on July 15, but Washington testified that when he visited Hughes, Hughes stated that "[Defendant]'s not [sic] the going to be in trouble. No, he got medical papers saying that he is sick." (W. Rojas Dep. 48:23–24). Plaintiff also testified that Washington told him that "Calvin told [Washington] not to worry, that everything was fine." (S. Rojas Dep. 42:13–14).[6] Thus, questions remain as to why Hughes would have assuaged Washington, if Washington reported to him after Plaintiff had already been terminated on July 15, and Hughes may well have participated in that decision to terminate. (*See* Raimone Dep. 37:8–11 (ABL "would usually send somebody from the human resource department down to

---

[6] Defendant "objects to th[is] statement as inadmissible hearsay to prove the truth of the matter asserted pursuant to Federal Rules of Evidence 801 and 802." (Def. Rep. at 15). However, Fed. R. Evid. 801(d)(2)(D) entails that this statement is excluded from the rule against hearsay: "A statement that meets the following conditions is not hearsay: . . . The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ." The statement that Plaintiff recalls in his deposition is offered in opposition to Defendant, (*see* Pl. Stat. Mat. Facts ¶ 35), and was made by ABL's agent, Calvin Hughes, within the scope of his relationship with ABL. See the discussion of "Shop Stewards" in Sec. (I)(A)(3)(a) at *supra* 9–11.

sit with the shop stewards . . . and they would make the decision for termination.")).  Finally, Raimone testified that he "had heard from the shop steward that [Plaintiff was] not in the country" and that Otis Abraham informed him of this fact.  (Raimone Dep. 42:16–24).

This evidence does not clearly establish a date on which ABL acquired notice of Plaintiff's illness.  The above evidence suggests that a reasonable finder of fact could conclude that Defendant had knowledge of Plaintiff's illness on July 15 when it terminated Plaintiff via letter.  Yet Defendant contends that "the undisputed record reveals that no ABL manager even knew that Plaintiff's evidence was related to his Diverticulitis when he was fired."  (Def. Stat. Mat. Facts ¶ 46).  There is, thus, a genuine issue of material fact as to whether ABL had notice of Plaintiff's disability prior to his termination.

### 4. Replacement

The fourth and final prong of the *McDonnell Douglas* test requires that "the employer sought someone to perform the same work after" Plaintiff's termination.  *Zive*, 182 N.J. at 450.  In *Zive*, the fact that the replacement employee is "performing [the plaintiff's] functions" was "all that is required" to satisfy this prong.  *Id.* at 456.  As such, Plaintiff satisfies this prong.

Plaintiff is "highly skilled" and "[h]e was so valuable to [ABL]" for this reason.  (Raimone Dep. 37:22, 39:25).  Raimone, ABL's Plant Manager, was asked whether "somebody else would have been operating [Plaintiff's] machine" after his termination.  (Raimone Dep. 38:3).  Raimone responded that "[w]e filled the machine with a lesser skilled operator . . . [; w]e hired [that person] as a general helper."  (*Id.* at 38:18–19, 24).  Raimone then went on to affirm that "[e]ventually" ABL "hire[d] a head count and put him on [Plaintiff's] machine."  (*Id.* at 40:5–7).  This person was a "permanent employee for Acuity."  (*Id.* at 39:3–5).  Given the value, to ABL, of Plaintiff's job position and skill, and the testimony by the Plant Manager, a reasonable finder of fact could infer that the employer sought someone, a "permanent employee," to perform the same work Plaintiff performed before Plaintiff's termination.

Defendant claims that "[n]o one was permanently hired to replace Plaintiff." (Def. Stat. Mat. Facts ¶ 27 (citing Raimone Dep. 39:19-20)). There is, thus, a genuine issue of material fact as to whether Plaintiff was replaced under *Zive.*

## B. DEFENDANT'S PROFFERED REASON

In light of above analysis, this Court finds that Plaintiff has met his *prima facie* burden for defeating summary judgment. The Court must next analyze whether Defendant has offered a suitable, non-discriminatory reason for Plaintiff's termination. *See Zive*, 182 N.J at 449.

Defendant argues that "Plaintiff was let go for failing to adhere to ABL's no-call/no-show policy" and that this is a "legitimate, non-discriminatory reason for severing Plaintiff's employment." (Def. Br. at 14). Importantly, Defendant claims that this policy—that an employee can be terminated for three unauthorized absences in a row if the employee does not contact ABL to justify the absences—is contained in the "ABL Handbook," (*see* Def. Br. at 15), while Plaintiff claims that "[t]here was no Handbook that applied to hourly employees, such as Mr. Rojas, in July 2011." (Pl. Stat. Mat. Facts ¶ 6) (citing Feld. Dep. 90:8–13)). (*See* OA Tr. 51:17–19 (Defendant's counsel stating that "the plaintiff testified that he didn't receive [the handbook] . . . in summary judgment we have to take the plaintiff's word at face value")). Defendant cites no law that supports the proposition that the Handbook at issue must apply to an employee with Plaintiff's status. Hence, whether Plaintiff had notice of this policy and whether it even applied to him at all are also genuine issues of material fact.

## C. EVIDENCE OF PRETEXT

While the Court does not believe Defendant's proffered nondiscriminatory rationale is sufficient as a matter of law, the Court considers evidence of pretext for the sake of thoroughness. Defendant addresses the issue of pretext at page 15 of its brief in support of its motion for summary judgment.

If the Defendant had proffered a non-discriminatory reason for Plaintiff's termination, with respect to which there were no genuine issue of material fact, "the burden of production [would] shift[] back to the employee to prove by a preponderance of the evidence that the reason articulated by the employer was merely a pretext for discrimination and not the true reason for the employment decision." *Zive*, 182 N.J at 449.  But in order to prevail at the summary judgment stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 456 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder *could* rationally find them unworthy of credence." *Fuentes,* 32 F.2d. at 765.

Plaintiff argues that a "jury may find that there were 'extenuating circumstances' for Plaintiff's inability to return in July" and, accordingly, "it is clear that a reasonable jury could find that ABL's explanation that [Plaintiff] was fired for violating a [no-call/no-show] 'policy' was pretextual."  (Pl. Br. at 19 – 20).  Plaintiff's termination letter, dated July 15, stated that Plaintiff "will be considered to have voluntarily resigned [his] employment from [ABL] *barring any extenuating circumstances*."  (Dillon Cert. Ex. K (emphasis added)).  It is not unreasonable to regard the medical issues that allegedly confined Plaintiff to Ecuador, detailed above in the context of the first prong of the *McDonnell Douglas* test, as "extenuating circumstances."  Beyond the documentation that appears to support this particular instance of illness, there is evidence that corroborates a history of illness and thus suggests that Plaintiff's report of Diverticulitis in Ecuador was genuine.  If so, the circumstances requiring Plaintiff's absence were genuinely extenuating.

Brad Feldmeyer testified that he read and understood Plaintiff's Exhibits I and J, medical certificates diagnosing Plaintiff with Diverticulitis and stating that he should rest, when Plaintiff provided them—allegedly, for at least the second time—upon his return from Ecuador. (*See* Feld. Dep. pp. 80–84). In his deposition, Feldmeyer was asked: "And did you consider that if Mr. Rojas was suffering from this medical condition in Ecuador that this would constitute an extenuating circumstance as to why he was prevented from returning to the United States on time?" Feldmeyer responded, simply, "Yes." (*Id.* at 80:5). Feldmeyer later affirmed the same proposition. (*See* Feld. Dep. 84:4–8).

The foregoing evidence suggests that a rational finder of fact could find ABL's proffered evidence to be pretextual, rather than worthy of credence: If the terms of Plaintiff's termination letter state that extenuating circumstances could save Plaintiff his job, and Plaintiff presented reasonably good evidence of such circumstances, Defendant's alleged termination rationale is called into question. More doubt arises when this Court considers that:

- Plaintiff worked for ABL (and, previously, its predecessor company) continuously for approximately *28 years*, (*see* S. Rojas Dep. 145:4–6);

- Plaintiff's termination letter was dated *as soon as possible* after three-day-absence termination policy was triggered, (*see* Dillon Cert. Ex. K);

- Plaintiff has had no problems with attendance or tardiness and has never been disciplined for any misconduct, (*see* Feld. Dep. 37:20–38:1); and that

- Defendant's proffered termination rationale allegedly rests entirely on a single lapse, of three days in duration, in Plaintiff's work attendance. (*Cf.* Def. Br at 12 ("Plaintiff did not miss *any* work because of his Diverticulitis" in the three years prior to 2011 and "he has promptly returned to work ready and able to work" after each time he has suffered from his illness) (emphasis in original)).

Accordingly, judgment as a matter of law that Defendant has rebutted the inference raised by Plaintiff's *prima facie* case of disability discrimination is inappropriate.

### IV.  AGE DISCRIMINATION UNDER THE NJLAD

### A. *PRIMA FACIE* CASE

To establish a *prima facie* case of age discrimination in violation of the NJLAD, Plaintiff must prove that (1) he was a member of the protected class; (2) he was performing his job at a level that met his employer's legitimate expectations; (3) he nevertheless was fired; and (4) the employer sought someone sufficiently younger than the plaintiff to perform the same work after he left. *Zive*, 182 N.J. at 450; *Monaco v. Am. General Assurance Co.*, 359 F.3d 296, 309 (3d Cir. 2004).

Defendant does not contest that Plaintiff meets the first and third elements of a *prima facie* case for age discrimination. As to the second element, the Parties make the same arguments already addressed by the Court in its disability discrimination analysis. (*See supra* Sec. (III)(A)(2)). For the reasons already stated, the Court finds that the evidence in the record creates a genuine issue of material fact as to the second element.

### 1.  The Fourth Element Under *Monaco*:

Defendant argues that Plaintiff cannot establish the fourth element of an age discrimination claim because Plaintiff cannot show that he was replaced by someone "sufficiently younger." The Third Circuit has held that the fourth element of a *prima facie* case of age discrimination requires the plaintiff to show that the employer replaced him with a sufficiently younger employee. *Monaco*, 359 F.3d at 300. Plaintiff argues that he only needs to show that the employer sought someone to perform the work after the complainant had been removed. (Pl. Br. at 22). The court in *Monaco* explicitly rejects the holding of *Petrusky v. Maxfli Dunlop Sports Corp.*, 342 N.J. Super. 77, 82-83 (App. Div. 2001) that a plaintiff need

17

not show that he was replaced by someone sufficiently younger, but only that the employer sought others to perform the work after the complainant had been removed.  *Id*. at 302.

Although *Monaco* dealt with the question of age discrimination in the reduction-in-force (RIF) context, that is not sufficient to distinguish it from conventional age discrimination cases.  A plain reading of *Monaco* clearly indicates that a plaintiff is required to show, in both RIF and traditional cases, that someone sufficiently younger replaced him or her.  *Monaco*, 359 F.3d at 300.  Moreover, the Third Circuit held that *Monaco* is not limited to RIF cases, and it applies to traditional age discrimination cases as well.  *Arenas v. L'Oreal USA Products, Inc.*, 461 Fed.App'x. 131, 134 (3d Cir. 2012).

Therefore, Plaintiff is required to show that he was replaced by someone *sufficiently younger* in order to satisfy the fourth element of his age discrimination claim under the NJLAD. Defendant asserts that Plaintiff cannot prove the fourth element of a *prima facie* case of age discrimination under the NJLAD because he was not replaced by anyone, let alone a sufficiently younger person.  (Def. Br. at 17).  Although the record indicates that Plaintiff was replaced by a "general helper" who was a "much lesser skilled" operator, no mention is made as to the age of this employee.  (Raimone Dep. 38:13-25).  Thus, Plaintiff has presented no record evidence that he was replaced by a sufficiently younger employee.  Therefore, Plaintiff cannot establish a *prima facie* case of age discrimination.  Accordingly, Defendant's motion for summary judgment as to Plaintiff's age discrimination claim under the NJLAD is GRANTED.

## V.     ETHNIC OR NATIONAL ORIGIN DISCRIMINATION UNDER THE NJLAD

A *prima facie* case of national origin and/or ethnic discrimination requires Plaintiff to show that he: (1) belongs to a protected class; (2) has the proper qualifications for the job; (3) was negatively affected by the defendant's employment decisions; and (4) was treated less favorably than employees not within the same protected class.  *Daniels v. Borough of Spring*

*Lake Heights*, No. 07-4921, 2009 U.S. Dist. LEXIS 85520, at *17 (D.N.J. Sept. 18, 2009). Once a plaintiff-employee has established a *prima facie* case of discrimination, the *McDonnell Douglas* burden shifting framework applies.  *See Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 492-93 (1982).

As to the first element, Plaintiff belongs to a racial/ethnic minority as a Hispanic-American man from Ecuador, and therefore belongs to a protected class.  (S. Rojas Dep. 10:5-12).  As to the second element, it is clear that Plaintiff has the proper qualifications for the job. Plaintiff's supervisor noted that he was very valuable to ABL, difficult to replace, and "highly skilled"—especially because he worked at ABL for 28 years.  (Raimone Dep. 53:6-18; 37:22); (S. Rojas Dep. 145:4-6).  As to the third element, Plaintiff was negatively affected by Defendant's employment decision because he was terminated from his employment. (Plaintiff's termination is discussed in the disability analysis.  (*See supra* Sec. (III)(A)(3)). Thus, the Court finds that Plaintiff has met his burden as to the first three elements of an Ethnic or National Origin claim, for summary judgment purposes. However, the fourth element, that Plaintiff was treated less favorably than other employees not within the same protected class, is at issue.

### A.  Fourth Element: Plaintiff Treated Less Favorably

There is a factual dispute surrounding the alleged discriminatory comments made by Dominick Raimone, including what was said, when, to whom, and also whether Raimone was a decision-maker.

### 1.  Allegedly Discriminatory Statements Made by Raimone

Plaintiff argues that Raimone allegedly stated that he "wanted to clean the factory of Hispanic and older workers."[7]  (S. Rojas Dep. 164:17-165:8).  Moreover, Plaintiff asserts that

---

[7] Defendant "objects to th[is] statement as inadmissible hearsay to prove the truth of the matter asserted pursuant to Federal Rules of Evidence 801 and 802." (Def. Rep., at 11). However, Fed. R. Evid. 801(d)(2)(D) provides that this statement is not hearsay for the same reason as in n.6.

Raimone would always tell Plaintiff that he wanted Plaintiff to speak "English, English", even though he was aware that Defendant only spoke limited English.  (*Id.* at 34:13-15).  Also, Raimone notes that "it wasn't a rule" that everybody had to speak English, but that he wanted everyone to feel a little bit more comfortable.  (Raimone Dep. 33:11-13).  Moreover, some workers believed that Raimone "wanted to fire all Hispanics because he wanted to put the American people that want to work."[8]  (S. Rojas Dep. at 152:13-17).  Furthermore, Plaintiff asserts that Raimone was mistreating him and many of the Hispanic people, including a Colombian employee who left and was being harassed for the same reasons, Plaintiff testifies that he saw Raimone allegedly yell "right in his face."  (S. Rojas Dep. 154:8-17).  In addition, Brad Feldmeyer, the HR manager, did not investigate complaints brought by Anthony Esponda, Plaintiff's Union representative, that Raimone was treating the Spanish-speaking employees differently by telling them that they had to speak English.  (Feld. Dep. 26:1-3).  Importantly, there was no ABL rule requiring that employees speak English.  (Raimone Dep. 33:11-13).  Feldmeyer never interviewed any of the employees and treated the matter as an "inquiry" rather than a formal "complaint."  (Feld. Dep. 27:10 - 32:15).

## 2.   Whether Raimone is a Decision-maker

Moreover, there is a factual dispute as to whether Raimone is a decision maker.  Defendant claims that Raimone is not a decision maker and played no part in the decision to terminate Plaintiff.  (Def. Br. at 20).  It is not enough, for a showing of ethnic or national origin discrimination that discriminatory comments were made by someone who did not participate in the decision to terminate employment.  *Maietta v. UPS, Inc.*, 749 F. Supp. 1344, 1371 (D.N.J. 1990).  In response, Plaintiff states that Raimone is a decision maker because he evaluated the workforce, made recommendations, and discussed the employees with Feldmeyer.  (Pl. Opp.

---

[8] Defendant "objects to th[is] statement as inadmissible hearsay to prove the truth of the matter asserted pursuant to Federal Rules of Evidence 801 and 802." (Def. Rep. at 11). However, Fed. R. Evid. 801(d)(2)(D) provides that this statement is not hearsay for the same reason as in n.6.

Br. at 27).  Moreover, Raimone was Plaintiff's direct supervisor.  (Raimone Dep. 7:17-38:1).

Also, Plaintiff, in his testimony, believes that Raimone was the one who gave the order to

terminate his employment.  (S. Rojas Dep. 37:5-13).  Because there is a clear issue of fact as

to Raimone's status, Defendant's motion for summary judgment as to Plaintiff's national

origin/ethnicity discrimination claim under the NJLAD is denied.

## VI.    FMLA CLAIM

To present a claim under the FMLA, a plaintiff must show: (1) he is an eligible

employee, (2) the defendant is a "covered employer," (3) he is entitled to leave under the

FMLA, (4) he gave the employer notice, and (5) the defendant denied or interfered with the

plaintiff's FMLA benefits.  *Parker v. Hahnemann University Hosp.*, 234 F. Supp. 2d 478, 483-

84 (D.N.J. 2002).

The parties do not dispute the first two elements and agree that Plaintiff is an "eligible

employee" and Defendant is a "covered employer."  (Pl. Opp. Br. at 30).  At issue are elements

(3), (4), and (5).

### A.  Serious Health Condition

Defendant argues that Plaintiff does not satisfy the third element because he is not

entitled to leave under the FMLA.  Plaintiff argues that he is entitled to leave under the FMLA

because his condition constitutes a "serious medical condition."

An employee who is unable to work because of a "serious health condition" is entitled

to FMLA leave.  29 U.S.C. § 2612(a)(1)(D).  The term "serious health condition" is defined as

an illness, injury, impairment, or physical or mental condition that involves continuing

treatment by a health care provider.  29 U.S.C. § 2611(11).  "Continuing treatment" includes a

period of incapacity of more than three consecutive days and any subsequent treatment or

period of incapacity that involves (1) two or more in-person visits to a health care provider,

within 30 days of the first day of incapacity, or (2) an in-person visit with a health care provider

which results in a regimen of continuing treatment under the provider's supervision.  29 C.F.R. § 825.115 (2013).

Here, there is evidence in the record that creates a genuine issue of material fact as to whether Plaintiff suffered a "serious health condition."  According to Plaintiff's testimony and notes from his physician, Plaintiff was incapacitated for more than three consecutive days following his July 8, 2011 visit with Dr. Valdiviezo in Ecuador.  (Pl.'s Opp'n Br. at 31). Plaintiff remained incapacitated and was subsequently treated on August 1st, at which time his leave was continued through September 8th when he was released.  (*Id.*).  Furthermore, Feldmeyer testified that he understood the medical condition suffered by Plaintiff to have constituted a serious medical condition under the FMLA.  (Feld. Dep. 79:16-20).  Feldmeyer also testified that Mr. Rojas's diagnosis and inability to return to work could constitute an "extenuating circumstance" for being out of work.  (*Id*. 84:4-7).  Based on Plaintiff's testimony, medical documents, and Feldmeyer's testimony, a reasonable trier of fact could find that Plaintiff was incapacitated for more than three consecutive days and subsequently received continuing treatment while still incapacitated in Ecuador.  Thus, summary judgment is inappropriate on this issue, and Defendant's motion is accordingly denied.

### B.  Notice

The fourth element of "notice" under the FMLA is also contested.  Defendant argues that Plaintiff did not provide Defendant with adequate notice of his medical condition and need to take leave.  Plaintiff argues that he did provide adequate notice to Defendant.  To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave.  29 U.S.C. § 2612(e)(2).  In doing so, the employee "need not expressly assert rights under the FMLA or even mention the FMLA."  29 C.F.R. § 825.303(b).  When the leave is unforeseeable, the employee's obligation is to "provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  *Id*.

"This is not a formalistic or stringent standard."  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 303 (3d Cir. 2012).

Plaintiff was not required to expressly assert rights under the FMLA; rather, only to provide sufficient information upon which Defendant could reasonably determine that FMLA might apply.  Here, as the Court has already determined, issues of material fact exist as to the date Plaintiff provided notice to Defendant and the adequacy of such notice, within the context of the disability claim.  (*See* Sec. (III)(A)(3)(b)).  Thus, summary judgment on this issue is inappropriate, and Defendant's motion is accordingly denied.

### C.  Interference

The fifth element is whether Defendant interfered with Plaintiff's FMLA benefits.  An employee can seek recovery for FMLA rights violations under an "interference" theory and/or a "retaliation" theory.  *Parker v. Hahnemann University Hosp.*, 234 F. Supp. 2d 478, 485 (D.N.J. 2002).

To assert an interference claim, "the employee only needs to show that (1) he was entitled to benefits under the FMLA and (2) that he was denied them."  *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006).

With respect to the first element, the Court has already determined, in the previous sections on the FMLA, that issues of fact exist as to whether Plaintiff suffered a "serious health condition" and provided adequate notice.  As to the second element, Defendant cites no record evidence showing Plaintiff received FMLA benefits.  Thus, Defendant's motion for summary judgment on Plaintiff's FMLA interference claim is denied.

### D.  Retaliation

To prevail on a retaliation claim under the FMLA, a plaintiff must prove that (1) he invoked his right to FMLA-qualifying leave, (2) he suffered an adverse employment decision, and (3) the adverse action was causally related to his invocation of rights.  *Lichtenstein*, 691

F.3d at 301-02. "To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave." *Id.* at 303; *see also* 29 U.S.C. § 2612(e)(2). Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law. *Lichtenstein*, 691 F.3d at 302. Accordingly, claims based on circumstantial evidence, as here, have been assessed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Plaintiff's FMLA retaliation claim raises the same issues of "notice" and "pretext" that the Court has already addressed. (*See* Secs. (I)(A)(3)(b) and (I)(C)). Given that the Court has already determined that conflicts of fact surround these issues, Plaintiff's FMLA retaliation claim survives summary judgment.

## VII. PUNITIVE DAMAGES

In order to recover punitive damages pursuant to the NJLAD, the New Jersey Supreme Court has established two prerequisites: the offending conduct must be "especially egregious;" and there must be "actual participation in or willful indifference to the wrongful conduct on the part of upper management." *Rendine v. Pantzer*, 141 N.J. 292, 314 (1995).

Evidence in the record suggests that a reasonable finder of fact could conclude that ABL, or its agent, has acted in an "especially egregious" manner in perpetrating the national origin/ethnic discrimination that Plaintiff alleges. Plaintiff testified as to what he perceived to be the discriminatory attitudes of the Plant Manager, Dominick Raimone:

> Q. Do you recall providing a response that Dominick would ask you when you were going to retire and stated that the company was cleaning house of older workers?
>
> Mr. GEVERTZ: Objection to form.
>
> A. Yes. *He wanted to clean the factory of Hispanic and older workers, older employees.*
>
> Q. Who made that remark? Dominick?

A. All the workers knew about it.

(S. Rojas Dep. 164:17–25 (emphasis added)).   When asked more specifically whether Dominick Raimone made such remarks, Plaintiff responded: "Yes. That's what Dominick said." (S. Rojas Dep. 165:8).[9]  Moreover, Plaintiff testified that "Dominick wanted to fire all Hispanics because he wanted to put the American people that want to work."  (S. Rojas Dep. 152:15–17).[10]  A reasonable finder of fact can conclude that these actions or attitudes toward Hispanic persons are "especially egregious."

Moreover, Plaintiff argues that "a jury could reasonably find" that Raimone, who held the title of Plant Manager, "was a member of upper management."  (Pl. Opp'n Br. at 38).[11] Raimone, between the years of 2005 and 2008, had authority to hire and fire employees. (Raimone Dep.36:14 -17).   Plaintiff alleges that Raimone "fired Spanish speaking people: 32 year old Ecuadorian male; Jorge Fraga; [and, Plaintiff] Segundo Rojas." (Dillon Cert. Ex. C. ¶ 16 (Answers to Interrogatories)).  Raimone testified that he was entrusted with the power to

---

[9] Despite Defendant's objection, (see Def. Rep Stat. Mat. Facts at 41), Fed. R. Evid. 801(d)(2)(D) mandates that this statement is excluded from the rule against hearsay: "A statement that meets the following conditions is not hearsay:. . . The statement is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ."  The statement that Plaintiff recalls in his deposition is offered in opposition to Defendant, (see Pl. Stat. Mat. Facts ¶ 82), and was made by ABL's agent, Dominick Raimone, within the scope of his relationship with ABL.

[10] Plaintiff reported that he "heard the people [i.e., coworkers] saying" that Raimone harbored this attitude.  Defendant objected to the consideration of this testimony, "to the extent that . . . [it] consists of statements other people said, as inadmissible hearsay under Federal Rules of Evidence 801-802."  (Def. Rep. at 41). However, the same reasoning that holds in note 6, as well as the note directly above, applies here as well.

[11] The New Jersey Supreme Court opined on the term "upper management:"

> For an employee on the second tier of management to be considered a member of "upper management," the employee should have either (1) broad supervisory powers over the involved employees, including the power to hire, fire, promote, and discipline, or (2) the delegated responsibility to execute the employer's policies to ensure a safe, productive and discrimination-free workplace.

Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 129 (1999).  It is worth noting that whether Raimone was "an employee on the second tier of management," as opposed to the first tier, is a question of fact for a jury to consider. See Domm v. Jersey Printing Co., Inc., 871 F. Supp. 732, 739 (D.N.J. 1994) (denying a motion for summary judgment on punitive damages and stating that "[t]he issue of punitive damages is a fact question which should be decided by a jury").

interview prospective employees.   (*Id.* at 37:2–4).   Raimone also was responsible for "ke[eping] . . . disciplinary report[s]" and reviewing vacation requests.  (*Id.* at 57:14–15, 63:4–9).  This evidence suggests that the Court cannot rule, as a matter of law, that ABL's Plant Manager Raimone did not act in an "especially egregious" manner and that he was not a member of ABL "upper management."

Second, Brad Feldmeyer, the head of human resources for ABL, received complaints that were brought to his attention by a union representative that "Dominick [Raimone was] treating Spanish speaking employees differently" by repeatedly insisting that they speak English, (*see* Feld. Dep. 26:2–3), even though the request that they speak English was not required by any company policy and "wasn't a rule."  (*See* Raimone Dep. 23:11).  Feldmeyer testified that he did not treat the employee grievances brought to his attention by the union representative as a "formal complaint."  (Feld Dep. 28:1–2).  Accordingly, Feldmeyer chose not to interview any of the aggrieved employees, (Feld Dep. 27:19–21), and did not "take any written statements from anybody who was complaining about the behavior of Dominick Raimone."  (*See id.* at 27:22–25, 28:1–2).  A reasonable finder of fact could conclude that this behavior amounts to "willful indifference to the wrongful conduct on the part of upper management," and that such behavior is "especially egregious."  (*See Rendine*, 141 N.J. at 314).   Evidence in the record also suggests that Feldmeyer himself was part of upper management, bearing broad supervisory powers over the involved employees.  (*See, e.g.,* Feld. Dep. 107:18–20 ("Who made the decision to terminate Segundo Rojas? The recommendation was made by myself.") (internal quotation marks omitted)).

"[T]he purpose of the definition of 'upper management' is to 'provid[e] employers with the incentive not only to provide voluntary compliance programs [aimed at anti-discrimination] but also to insist on the effective enforcement of their programs."  *Cavuoti,* 161 N.J. at 128 (citing *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 626 (1993)).  A rational finder of fact could

conclude that Feldmeyer was wilfully indifferent to the complaints of discrimination brought to his attention by the union representative.  If so, the court's rationale in *Cavouti* and *Lehmann* suggests that this Court should adopt a definition of upper management that would include Feldmeyer, so as to provide ABL with the incentive to "insist on the effective enforcement" of an anti-discrimination program.  *See Cavuoti,* 161 N.J. at 128.  Therefore, this Court cannot rule, as a matter of law, that Feldmeyer did not act in an "especially egregious manner" or that he was a member of ABL's "upper management."

After all, "[t]he issue of punitive damages is a fact question which should be decided by a jury."  *Domm v. Jersey Printing Co., Inc.*, 871 F. Supp. 732, 739 (D.N.J. 1994).  In *Cavuoti*, the New Jersey Supreme Court emphasized the fact-sensitive nature of the determination whether punitive damages were warranted, and stated that "issues of liability for the acts of 'upper management' are intertwined with the qualitative nature of the misconduct, [and thus] the issue[] of . . . damages should be retried."  161 N.J. at 131 (1.  Accordingly, this Court denies the motion for summary judgment on punitive damages.

## VIII. CONCLUSION

Defendant's motion with respect to Plaintiff's claim of age discrimination under the NJLAD is GRANTED.  The Defendant's motion for summary judgment as to each of Plaintiff's other claims—Plaintiff's NJLAD claims of disability and ethnic or national origin discrimination, with request for punitive damages, and Plaintiff's claim of violation of the FMLA—is DENIED.

s/*Esther Salas*
**Esther Salas, U.S.D.J.**